WATSON *v.* STATE, 36 Miss. R., 593.

LARCENY OF SLAVES.

Where a bill of sale has been procured by false and fraudulent misrepresentation, without any consideration, from a weak-minded old woman, who was under the care and protection of the defendant, it is competent evidence to establish the defendant's original intention. Wharton's Am. Cr. L., 1855; Bishop Cr. Law, 431; 2 East P. C, 685, 693.

A person leaving this state with the felonious intention of stealing slaves in another state, and bringing them into this state, and here converting them to his own use, and carries that design into execution, is guilty of larceny, and may be indicted in this state for such.

The legal possession of goods stolen continues in the true owner; and every moment's continuance of the trespass and felony amounts, in legal consideration, to a new caption and asportation, which may be the subject of indictment in every state to which the goods are removed.·

·Error to Clarke circuit court.

HANCOCK, J. :

The plaintiff in error and one N. Shotts were jointly indicted in the court below for the larceny of six slaves, which, in one count of the indictment, were alleged to be the property of Mrs. Elizabeth Peterson; and in the second, the property of the children (naming them) of Mrs. Peterson; and in the third count they were alleged to be the property of Mrs. Peterson and her children. The indictment charged, in the usual form, that the larceny was committed in Clarke county, in this state. Shotts and the plaintiff in error severed in the trial, and the plaintiff in error pleaded not guilty to the indictment.

It appears from the bill of exceptions that in the latter part of the year 1854 the defendant Watson and his co-defendant Shotts, and one Simon Box, went to a lawyer (Smith) in Clarke county, in this state, for the purpose of procuring his services in obtaining letters of guardianship for the minor children of Mrs. Peterson. It was then stated by Watson that he had removed Mrs. Peterson and her children to his house, in that county, and that they owned some negro property in Alabama, and that at his instance, Shotts had consented to become their guardian here, in order to procure a removal of the slaves from Alabama to this state. Letters of guardianship were obtained for Shotts from the probate court of Clarke county, and soon afterwards the witness procured a power-of-attorney from Shotts, authorizing one Morse to recover the negroes in Alabama, which, with the record of Shotts' appointment, was sent to said Morse. That about January 1st, 1856, this witness was advised, by a letter from Morse, that he had obtained possession of the negroes; and Shotts then gave Watson a power-of-attorney to go after the negroes, and to receipt to Morse for them; and shortly after this,

Watson returned to Clarke county, and informed the witness that he (Watson) had the negroes. That after the power-of-attorney was drawn up, and before Watson went to Alabama, he informed witness that he would not let Shotts have the negroes, as they were his. That afterwards, when the probate court was proceeding against Shotts for a failure to return his inventory, Watson told Shotts, in the presence of this witness, that he would not let him have the negroes; that he had given him (Shotts) his note for $200 for the power-of-attorney, and that he did not intend to pay that note.

It further appeared that, in the spring of 1856, Watson exhibited his letters of attorney to another witness (George Evans), and then declared that he intended to appropriate the negroes to his own use. Witness communicated this to Shotts and to one of Shotts' securities.

Shotts' final settlement as guardian, made January 6th, 1857, was introduced. In this he charges himself with the Peterson negroes. A receipt of Watson, as guardian for the Peterson children, acknowledging the receipt of these slaves from Shotts, the former guardian, was also introduced in evidence. This receipt was dated November 29th, 1856.

It further appeared that Watson brought the slaves to Clarke county; that he removed them from place to place clandestinely; that he offered to sell them in Alabama and this state; that on one occasion when he offered them for sale, he stated that his title was not good, and the purchaser would have to risk it; but that he would sell them so low that a speculation could be made out of them.

It further appeared that after Watson's appointment as guardian, he was committed to jail by the court of probates for a contempt, in not obeying its orders in reference to said slaves; that while he was thus imprisoned, he sent for one of the witnesses, and asked him to use his influence to procure his release; and promised that if witness would procure his release, he would return five of the slaves. He stated to this witness that he had sold all the negroes, and that nobody but himself could get them back.

The surety of Shotts, on his guardian's bond, to whom wit-

ness, Evans, had communicated what Watson had stated in ref-
erence to appropriating the slaves to his own use, immediately
went to Shotts and informed him of it, and requested him to go
to Alabama and revoke the power-of-attorney, and prevent a de-
livery of the negroes to Watson. Shotts denied to this witness
that he had given the power-of-attorney. Witness then carried
Shotts to the lawyer who drew it up, and Shotts then confessed
it, and promised to prevent Watson from getting the negroes.

It was further proved in evidence that, in 1856, when the
probate court was proceeding against Shotts for a failure to re-
turn his inventory as guardian, and when Shotts was endeavor-
ing to get a continuance for one term, that Watson was present,
and stated that he had given $200 for the power-of-attorney
from Shotts, authorizing him to get the negroes from Morse;
and if the continuance was granted, that before the next term
of the court, he would have the negroes run to Texas.

Witness Williams, who was appointed guardian of the Peter-
son children, after the removal of Watson from office, stated
that he had received only one of the negroes.

The defendant read in evidence the appointment of Shotts as
guardian, the final settlement of Shotts, and his own appoint-
ment, and an order of the court of probates directing Shotts to
deliver over the estate of his wards to defendant; also an order
of the said court, ordering his bond to be put in suit, and an
order directing the defendant to be confined in jail for a con-
tempt, in refusing to account with and deliver over to the order
of said court said slaves. The defendant read in evidence a
deed of gift from James Fare, the father of Mrs. Peterson, by
which the slaves in controversy were given to her and her chil-
dren. This deed was dated in 1843. He then read in evidence
a power-of-attorney from Mrs. Peterson, dated November 7th,
1854, and authorizing him to take possession of the said slaves,
and to sell and dispose of them as he saw proper. He then
read in evidence a bill of sale of the slaves, made by Mrs. Peter-
son, on March 16th, 1855, by which the said slaves were con-
veyed to him for $7,000.

The defendant then introduced Mrs. Peterson, who identified
the slaves mentioned in the indictment, except two, as the same

mentioned in the deed from her father to her, and as the same mentioned in her bill of sale to the defendant. She further stated that she executed said bill of sale, but stated that she did so without any consideration. She denied that she signed the power-of-attorney to defendant, before referred to.

On cross-examination, she stated that the said bill of sale was never intended by her to convey her title to the slaves, but that she was induced to sign the same through the false representations of the defendant, who induced witness to believe that one Simeon Box and one Nathaniel Shotts had some claim on the property, and that they intended to enforce it, and thus deprive her of her own slaves; and the only way to avoid their claim was to convey her property to him; and that, by their false representations, she was induced to make the bill of sale. She further stated that the defendant, Watson, had induced her to come to the state of Mississippi, by promising to furnish her with land, and that he would take care of her and her children, which he had never done.

To so much of the witness' testimony, on cross-examination, as tends to show fraud in the bill of sale, the defendant objected; but his objection was overruled, and he excepted.

Simeon Box, for defendant, stated that he had sold to defendant, for Mrs. Peterson, an interest in a mill, and that soon afterwards he met Mrs. Peterson, who requested him to rescind the trade, for the reason that she had sold all of her negroes to defendant.

Nathaniel Shotts (co-defendant) was sworn for the defendant, and stated that on the 7th of November, 1854, he was a justice of the peace in Clarke county, and that on that day Mrs. Peterson came before him with the power-of-attorney heretofore mentioned as given by her to Watson, and stated that she wished to execute the same, but was unable to write; whereupon witness signed her name to the instrument, and she made her mark. This occurred at defendant's house, where Mrs. Peterson was living at the time.

Cross-examined.—Witness states that he did not read the power-of-attorney to Mrs. Peterson, and did not know she had

read it.   He stated to her a part of the contents; Watson also stated to her some of its contents.

The defendant proved, by a deputy sheriff of Clarke county, that the witness had an execution in his hands against Watson, and was endeavoring to levy it on the negroes in controversy, about the time he was removing the said slaves from place to place clandestinely.

The bill of exceptions recites that "evidence was then introduced by the State which went to show that Mrs. Peterson was of very weak and imbecile mind;" to which defendant objected; but his objection was overruled, and he excepted.   Proof was introduced by the State showing the value of each of the slaves.

This was all the evidence.

The court gave the following instructions, at the instance of the State:

1. If the jury believe, from the evidence, that the defendant took and carried away the slaves named in the indictment, or any of them, with a felonious intent, he is guilty.

2. If the defendant took possession of the property under color of legal proceedings, yet if those proceedings were instituted at the instance of the defendant, and with an original felonious intent, then he is guilty of larceny, and the jury should find him guilty.

3. It is not necessary that Watson should have disposed of the slaves mentioned in the indictment; if he took them with a felonious intent, and had them in the county of Clarke, he is guilty, and the jury should so find.

4. If the jury find Watson guilty, they should separately find the value of each slave, which is shown by the evidence to have been feloniously taken.

5. If the jury believe, from the evidence, that Watson obtained possession of the slaves named in the bill of indictment, or either of them, in due and regular course of law, yet with an original felonious design, by him conceived and expressed, to deprive the true owner or owners of the use of them, and to convert the same to his own use, and that he did, in pursuance of such original felonious design (although aided by the process

of the law, deprive the true owner or owners of the slaves, or either of them, and convert them to his own use, then the law is with the state, and the jury should find the prisoner guilty.

6. That if the defendant conceived an original felonious design in this state and county, to deprive the true owner or owners of the use of the slaves, and to convert them to his own use, and obtained legal possession of them in the state of Alabama, and afterwards brought them to this state and county, and then, in pursuance of such original felonious design, conceived in this state, did deprive the owner or owners of the property of the use thereof, then that is a taking within this state within contemplation of law; and if the jury believe, from the evidence, that the defendant did so take the slaves, the law is with the state, and the jury should find the defendant guilty.

The following instructions were asked by the defendant. The 3d and 6th were given, and the others refused.

1. That if the jury believe, from the testimony, that Watson got possession of the said slaves in the state of Alabama, as the agent of Shotts, who was the guardian of the Peterson children, and that Watson then held the same as such agent until his subsequent appointment as guardian in the stead of Shotts, and then receipted to Shotts for said slaves, as guardian aforesaid; although they may believe he subsequently converted the negroes to his own use, his possession was one of trust, and not a felony, and the jury must acquit.

2. That if the jury believe, from the evidence, that Watson had, previous to the alleged felony, acquired the title and interest of Mrs. Peterson in the property mentioned in the indictment, although they may believe that such title was procured by fraudulent means, still he is a co-tenant in common with the Peterson children; his subsequent conversion of the whole of the property to his own use, although a wrong, is not a felony, and the jury must acquit.

3. That to make out the charge of larceny it is necessary to prove a taking and carrying away in the county in which the alleged felony is charged to have been committed, and that the state, to sustain this prosecution, must prove a taking and carrying away in Clarke county.

4. Though the jury may believe, from the evidence, that the defendant received a conveyance of the negroes mentioned in the indictment from Mrs. Peterson, with the intention of converting them to his own use, and afterwards, in furtherance of such design, procured from Shotts, the then guardian of Mrs. Peterson's children, a power-of-attorney to receive said negroes, and bring them into this county, and convert them to his own use; yet if they further believe from the evidence that said conveyance and power-of-attorney were freely executed by Mrs. Peterson and Shotts respectively, they cannot find the defendant guilty under this indictment.

5. That the fact that Mrs. Peterson is of weak mind is no evidence that she did not freely and voluntarily execute said conveyance.

6. If the jury believe, from the evidence, that there were no such negroes as Lucy and Oliver belonging to either or any of the parties mentioned in the indictment, then, so far as these negroes are concerned, the jury must acquit.

The jury returned a verdict of guilty, and the defendant moved for a new trial, which being refused, he tendered a bill of exceptions, and sued out this writ of error.

*F. Anderson,* for plaintiff in error.

1. If any crime was committed in this case, it was committed partly in Alabama and partly here; and is, therefore, not indictable in this state. If the crime has been committed in Alabama, and the goods above named removed here by the prisoner, he is not indictable here. Simpson v. State, 4 Humph., 458; People v. Gardner, 2 Johns. R., 477; People v. Schenck, ib., 479; State v. Brown, 1 Heywood R., 100; Story's Confl. L., §§ 619–624; Butler's case, 3 Institutes, 113; 2 East, 772; 38 Eng. Com. L., 23.

2. In cases of this kind there must be a conversion; and there was no conversion in Alabama, and therefore there was no larceny there, and there was no felonious taking in this state, and hence there was no larceny here. 2 Russ. on Cr., 53.

3. Under all the circumstances of the case, no larceny was committed; there must be something more than a felonious in-

tention at the time possession was obtained.   See Rex v. Walsh, 1 Russ. & Ry. Cr. Cases, 215; 2 Russ. on Cr., 30, 31, 32; 2 East Pl. Cr., 693.

*T. J. Wharton*, attorney general.

1. The facts prove clearly a case of larceny; the original taking was obtained by fraud, and with the intent then feloniously to deprive the owner of them.   2 Russ. on Cr. (5th Am. ed.), 7–9; 1 Hale P. C., ch. 33, § 8; 8 Porter, 511; Wharton Am. C. L. (1st ed.), 410; 2 East P. C., 685.

2. The possession in the state, at every step, was a new caption and asportation if the goods were originally in Alabama, and such being the case, it was larceny under the laws of this state.   See Bishop C. L., §§ 595–600, and §§ 650, 651; Barbour's C. L. (2d ed.), 167; 2 East P. C., 771, 772; 1 Hawkins' P. C., ch. 33, § 9; 5 Binney R., 619–627; People v. Burke, 11 Wend., 129; 1 Mass. R., 115; 2 ib., 14; 4 Humph., 456; Jones v. State, 30 Miss. R., 653; 3 Stew. Ala. R., 123; 14 Ala., 486; 18 ib., 727; 12 Missouri R., 453; 4 How. (U. S.) R., 410, 434; 7 Leigh., 752; 2 McMullen, 282; 1 Porter, 118.

HARRIS, J.:

The plaintiff in error was indicted, in the circuit court of Clarke county, for stealing certain slaves.   The offense was alleged to have been committed in the county of Clarke.   The plaintiff in error plead not guilty, and the cause was submitted to the jury on this issue.   Several objections were made to the admissibility of testimony, by the counsel for plaintiff in error, in the progress of the trial, which were overruled by the court, and exceptions taken and made part of the record, which will be hereafter noticed.   Also, the instructions given and refused; all which appear in the record.   The jury returned a verdict of guilty.   A motion was made for a new trial, which was refused, and the plaintiff in error sentenced to ten years imprisonment in the penitentiary.

From this judgment a writ of error is prosecuted here, and the following causes for reversal are assigned:

1st. The court erred in overruling the objection of the plain-

tiff in error to that portion of the testimony of Elizabeth Peter-. son drawn out on cross-examination, which went to show fraud in the bill of sale, executed by herself to plaintiff in error.

2d. The court erred in overruling the objection of plaintiff in error to the testimony introduced to show weakness and imbecility of mind of Elizabeth Peterson.

3d. The court erred in granting each and all of the instructions asked by the state, except the fourth.

4th. The court erred in each and all of the instructions asked by the defendant, numbering respectively, 1, 2, 4 and 5.

5th. The court erred in overruling the motion for a new trial.

The two first assignments of error relate to the testimony introduced by the state, for the purpose of showing the original, wrongful, fraudulent, and felonious intent of the defendant. That the bill of sale was procured by false and fraudulent representations, without any consideration, and under pretense of protecting the title and possession of her property, for her benefit, from a weak-minded old woman, under his care and protection, was certainly competent evidence to be submitted to the jury, to establish the defendant's original intent. Wharton's American Cr. L., § 1855; Bishop's Cr. L., § 431; 2 East P. C., 685 and 693.

The third assignment of errors embraces the instructions given by the court at the request of counsel for the state; and the fourth assignment embraces those asked by the defendant's counsel and refused.

We think the instructions, as given to the jury, taken together, present no ground of error for which the judgment should be reversed.

It is insisted that the sixth instruction for the state was erroneous. That instruction substantially asserts the position, that one leaving this state, with the felonious design of stealing slaves in Alabama, and bringing them into this state, and here converting them to his own use, and who carries that design into execution, both in Alabama and Mississippi, is guilty, as charged in the bill of indictment, of stealing here. It is said that, while it is true by the common law, that "if one steal

goods in one county and carry them into another county, he may be indicted in either county for the theft; but if one steals goods in one state, and carry them into another state, he is not liable in the latter state for larceny." And for this distinction we are referred to Butler's case, cited by Lord Coke, 13th part of his reports, page 52, Vol. VI, and to 3 Institutes, 113, and other text writers and cases, both English and American, founded on and citing Butler's case.

Butler's case was this. Butler and other pirates robbed some of her majesty's subjects, in the twenty-eighth year of the reign of Queen Elizabeth, off the coast of Suffolk, upon the high sea, and brought the goods into Norfolk, where they were apprehended, with the goods, and brought before Lord Coke, who was then a justice of the peace of that county. He says: "They confessed a cruel and barbarous piracy, and that the goods they then had with them were part of the goods they had robbed from the queen's subjects on the high sea. I was of opinion (says he) that in that case it could not be felony, punishable by the common law, because the original act—the taking of them—was not an offense whereof the common law taketh knowledge; and by consequence, the bringing them into a county, could not make the same felony punishable by our law; and it is not like where one stealeth goods in one county and brings them into another. There he may be indicted of felony in any of the counties; because that the original act was felony, whereof the common law taketh knowledge. And yet, notwithstanding, I committed them to the jail, until the coming of the justices of assizes; and at the next assizes, the opinion of Wray, C. J., and Periam, J., was, that forasmuch as the common law doth not take notice of the original offense, the bringing of the goods stolen upon the sea into a county did not make the same punishable at the common law." He adds: "And this in effect agrees with Lacey's case, cited in 2 Coke's R., 93, in Bingham's case."

This report of Butler's case was made by Lord Coke when he was chief justice, on a question of admiralty jurisdiction, arising in Hawkins' case, 13 Coke, 52, from which the above report is taken. The point there presented was, "If a man

committed piracy on the sea, and another, knowing thereof, receiveth and comforteth the defendant, within the body of the county, whether, under the Stat. 28, H. 8, ch. 16, he is indictable as a receiver and abettor, inasmuch as the offense of the accessory hath its beginning in the body of the county?"

"And it was resolved by them, that such receiver and abettor, by the common law, could not be indicted and convicted; because the common law cannot take cognizance of the original offense, because that is done out of the jurisdiction of the common law, and, by consequence, when the common law cannot punish the principal, the same shall not punish any one as accessory to such a principal; and, therefore, Coke, C. J., reported to them a case which was in Suffolk." Butler and others, as stated above.

Considered with reference to the question before the court, whether an accessory to an offense committed abroad, against another jurisdiction, and not cognizable by the common law of England, would be indicted and punished as such accessory, in England, or whether an offense committed against the laws of one jurisdiction, could be punished in another jurisdiction having different laws. Butler's case could only be in point to show, that piracy and robbery on the high sea could be punished in a county in England where it never happened.

The question here presented was never discussed, considered, or thought of, so far as we can learn from any report of Butler's case extant. And to show conclusively that this was the opinion of Lord Coke, and its extent, after stating that Butler and his confederates were committed to Sir Robert Southwell, vice-admiral of said counties, he adds: "And this, in effect, agrees with Lacey's case, which see in my reports, cited in Bingham's case, in 2 Reports, 93," &c. Upon referring to that case, it appears as follows: Lacey struck Peacock, and gave him a mortal wound, upon the sea, of which Peacock died, at Scarborough, in the county of York; and Lacey was discharged of it; for those of the county of York could not inquire of his death without inquiry of the stroke; and of the blow they could not inquire, because it was not given within any county. It is obvious, therefore, both from the purpose from which Lord Coke

cited Butler's case, as well as the direct statement that it agrees with Lacey's case, that the point here presented was never considered in Butler's case.

And that such is Lord Hale's understanding of Butler's case, see 2 Hale P. C., 18 and 163.

And in 3 Inst., 113, Lord Coke, in treating of the subject of "Piracy, &c., committed on the high seas," cites Butler's case to show that such offenses, committed out of the jurisdiction of any county in England, could not be there punished by the courts of the common law.

It will be perceived, therefore, that Butler's case was not designed to create an *exception*, but falls within a rule as old as the common law itself—that an offense, to be indictable, must have been completely committed in the county, and must be so charged in the indictment, and proved to the satisfaction of the jury.

But again: it is a principle universally admitted, and so Lord Coke states the rule in the Butler case, as cited, " that where one stealeth goods in one county, and bringeth them into another, then he may be indicted for felony in any of the counties." " Because," says Lord Coke, " that the original act was felony, whereof the common law taketh knowledge."

While the principle thus stated has been universally sanctioned, the *reason* assigned by Lord Coke is almost as universally omitted, and one given, not only much more satisfactory as to the foundation of this rule, but destructive of the exception sought to be engrafted on it by the construction placed upon Butler's case.

There never was a time in the history of the common law when it did take knowledge in one county of an " original act " of felony in another county, any more than it now takes notice of any crime in one state or county, committed in another. So jealous were our ancestors of the preservation of this principle, that the *venue* was always regarded as matter of substance; and, therefore, at common law, when the offense was commenced in one county, and consummated in another, the *venue* could not be laid in either, because no offense was committed in either.

1 Archb. Cr. P., 64, note; 1 Hale P. C., 651–53; Hawkins P. C., bk. 2, ch. 25, § 36.

That the reason assigned by Lord Coke above, for the principle stated, is not the true reason, or, indeed, any reason at all, will be abundantly manifest from an examination of the text-writers, both English and American, as well as adjudged cases cited by them.

Mr. Archbold, after stating this rule of the common law, and that it was always regarded as matter of substance, citing many examples from the books to show its strictness and explain its reasons, says: "At common law, however, if a party steals goods in the county of A., and carry them into the county of B., he may be indicted or appealed of larceny in the latter county. But this does not contradict the general rule, but is founded upon another principle, viz., that the possession of goods stolen, by the thief, is a larceny in every county into which he carries the goods, *because the legal poesession still remaining with the owner, every* moment's continuance of the trespass and felony amounts, in legal contemplation, to a new caption and asportation." 1 Arch. Cr. P., 63–4, note 1, and 69, note 2; 2 East P. C., 771–2.

So Mr. Russell says: "Larceny, like every other offense, must regularly be tried in the same county or jurisdiction in which it was committed; but it should be noted, with respect to larceny, that the offense is considered as committed in every county *or jurisdiction* into which the thief carries the goods; for the legal possession of them remains in the true owner, and every moment's continuance of the trespass and felony amounts to a new caption and asportation." 2 Russell Cr. Law, 116.

So, also, Lord Hale lays down the reason of the rule: "If A. robs B. in the county of C., and carries the goods into the county of D., A. cannot be indicted of *robbery* in the county of D., because the *robbery* was in another county; but he may be indicted of larceny or theft in the county of D., *because it is theft, wherever he carries the goods*." 1 Hale P. C., 507–8; 2 ib., 163.

The same principle, *for the same reason*, is stated in 2 Dyer R., 39.

And Lord Coke himself, in Bulwer's case, 7 Coke, 57, admits

the same principle. "For," says he, "felony doth not divest property."

Again: Mr. Hawkins says, "It is certain that he who steals my goods in the county of B., and carries them into the county of C., may be indicted or appealed in the county of C., as well as that of the county of B., *because the possession still continuing in me, every moment's continuance of the trespass is as much a wrong, and may come under the word* CEPIT, *as much as the first taking.*" Hawkins P. C., ch. 19, § 52, p. 151.

Mr. East states the same principle, and gives the same reason, in nearly the same language. 2 East's P. C., 771–2.

It is, then, for the reason so often repeated in the cases just cited, and not because of the supposed "knowledge" which the common law takes of offenses committed in different counties or jurisdictions, that the removal of stolen property from one county to another is universally admitted by the authorities to be a larceny in every county into or through which it is removed.

We again repeat, that never in the history of the common law did it take "connusance" *in one county* of offenses committed *in another*, any more than it took notice *in England* of offenses committed *in the United States.* The common law, in every age and every country where it has been recognized, has confined itself, in the punishment of crimes and misdemeanors, to the county where they have respectively happened. It has, therefore, recognized no such distinction, *in its* operation, between *counties* and *countries* as that supposed to be established by Butler's case. The *reason* assigned for the distinction, therefore, between counties and states, is wholly unsupported in fact or upon principle; and the *distinction*, thus originated, has only received the dubious sanction of three illy-considered cases in England. Rex v. Prowes, 2 Eng. Crown Cases, 348, decided in 1832, upon the authority of Butler's case; and Regina v. Madge, 38 Eng. C. L. R., 23, on the sole authority of Rex v. Prowes, decided in 1839; and Rex v. Anderson, decided in 1763, cited in 2 East, 772. And a few early cases in this country, following and citing the reasoning and authorities already referred to.

In support of this distinction we have been referred to several American authorities, and to text-writers, noting the exception supposed to be made by Lord Coke, in Butler's case, and giving that case and the reason it assigned for such exception.

The State v. Brown, 1 Hayward, N. C. R., 116, decided on the ground that there was but *one* offense, and not a new caption and asportation at every step, as held by the authorities already cited, and on the authority of Hawkins' P. C., citing Butler's case, so holds.

It is so held in Simpson v. State, 4 Humph., 456, and an elaborate argument made, to prove that when property is stolen in one state, and removed to another, the legal possession of the true owner is thereby lost, and the wrong-doer acquires a right thereto which gives him *criminal*, though not civil, immunity for the continued trespass and wrong.

The two cases from 2 John. (The People v. Lardiner, 477, and The People v. Schenck, 479), deciding the same way, and cited in 4 Humphries, neither furnish us *a single reason or authority* for their decision. On the contrary, in the first case two authorities are cited to the contrary. These two cases are subsequently directly overruled in 11 Wendell, independent of the statute, under which this last case occurred.

The only remaining case in this country where this exception is maintained, which has come to our notice, is the case of Simmons v. The Commonwealth, 5 Binney, 617.

This case is reviewed by Mr. Bishop, in his work on criminal law, vol. 2, § 596. After having stated in the previous section that: "Our courts cannot punish offenses against a foreign government, nor, therefore, take cognizance of such offenses. Neither, on the other hand, can a man be heard to excuse himself for a criminal act *here*, by alleging that he did the same thing *elsewhere*." He says: "Therefore, when a jury, sitting in Pennsylvania, found a special verdict, 'that the defendant did feloniously steal, take, and carry away the goods * * * within the state of Delaware, and that he brought the same into the city of Philadelphia, within the jurisdiction of this court,' the judges very properly refused to sentence the prisoner; while probably the jury, on the facts, might have rightly con-

victed him of larceny in Pennsylvania. Always, when a man has within him property in this state, we may look into the legal relation he sustains to it. If he has stolen it in another state, he has not the right to its custody even here; and the rule in larceny is, that when a man, having in his mind the intention to steal, makes any removal or carrying away of personal property, to the custody of which he has no right, he commits the crime.

"And, therefore, in the above case, the finding of the jury, in so far as it stated a larceny in Delaware, was wholly irrelevant; and in omitting to say whether there was a removal of the goods by trespass, with the intent to steal them, in Pennsylvania, it was defective."

See, also, the reasoning of Justice Breckinridge, in his dissenting opinion.

On the other hand, the cases and text-writers in this country, and more especially those of latest date, with the exception of those referred to above, repudiate this exception, and maintain the original rule, to be found everywhere in the law books, "that larceny is considered as committed in every county or *state jurisdiction* into which the the thief carries the goods, *for the reason* that the legal possession of them remains with the true owner, and every moment's continuance of the trespass and felony amounts to a new caption and asportation." 2 Russell Cr. L., 116; The People v. Burke, 11 Wend., 129; State v. Bartlett, 11 Vermont R., 650; Hamilton v. State, 11 Ohio, 435; Hemmaker v. State, 11 Missouri R., 453; The Commonwealth v. Cummins, 1 Mass R., 116; Same v. Andrews, 2 Mass. R., 14; Same v. Rand, 7 Metcalf, 477; Same v. Uprichard, 3 Gray's R., 434; Cummins v. State, 1 Harris. & Johns. R., 340; State v. Ellis, 3 Conn., 185; State v. Douglass, 17 Maine, 195; State v. Somerville, 21 Maine, 14; State v. Kinman, 7 Richardson S. C. R., 497. See, also, 1 Bishop's Cr. Law, §§ 595–600; 1 Archb. Cr. Pl., 68, note 2 (by Waterman, 6th edit.), and 63, 64, note 1; 2 Archb. Cr. P., 355, 13, 14, 15, note 1; Wharton's American Crim. Law, §§ 1815–17 (4th revised edition); 2 Russell on Crimes, (7th Amer. edit.), 116 and notes, 118 and 119 and notes.

It is said: "There can be *here* no new caption or asportation at every step, unless the original taking were a felony, under the laws of this State, and *indictable here.*"

Why should this be so? That a thief has stolen property in the county of Hinds is no more an offense punishable in Clarke than it would be in Alabama. Exemption from prosecution for such an offense is just as perfect in Clarke as it would be in Alabama or in England. It might, therefore, be said, with quite as much legal accuracy, that there can be no new caption or asportation in the county of Clarke, unless the original taking in Hinds were a felony under the laws of this state, *indictable in Clarke.* There is just as much reason for one position as the other.

The true question in every case is, not from whence came the wrong-doer, but has he committed larceny *in the county* where indicted? To ascertain this, we must look to the proof, in view of the definition of the offense.

The proof involves the intent and the act. The existence of the intent may be shown in any locality, county, state, or country. The commission of the act *must* be shown *in the county* where the indictment was had.

There is a wide difference between the proof of the *act* and the evidence of the *intent* with which it was done. The *intent* precedes the act, and may be evidenced at different times, and in various jurisdictions. It may be shown by the declarations of the actor, or by facts and circumstances happening in a distant country, or a different jurisdiction from that where the actual offense occurred. But the *act* which results from such unlawful intent, and is characterized by it, must be proved to have been committed in the particular county alleged in the indictment. See 1 Bish. Cr. Law, §§ 554, 556, 560, and many cases cited.

To give the court jurisdiction, whether by the common law or by our constitution, there must be a complete offense proved *in the county*, to the satisfaction of the jury, and not an offense in any other county or state.

To ascertain the ownership of the property, and the *bona fides* of the defendant's possession, in the county where the

offense is charged, it is competent to show the relation of the defendant to the property elsewhere, or that he came into possession of it in another county, or in another state or county, or even where no municipal law existed, by a wrongful and immoral act, contrary to the laws of nature; and that, in the prosecution of his original fraudulent design, he brought the property into the county where the indictment is found, and was *there* guilty of the illegal and felonious caption and asportation alleged against him.

While, therefore, the acts, the conduct, and situation of the accused in relation to the property, preceding the caption and asportation *in the county*, are evidence to his original and continued fraudulent intent, yet a man can neither be punished or escape punishment for larceny in one county, by reason of his having committed the like offense in relation to the same subject in another state or county. 1 Bishop, §§ 554 to 600.

And such is the principle clearly deducible from the case of Coon v. State, 13 S. & M., 246.

If it be true, as it is admitted from Butler's case to this day, everywhere, that the wrongful and fraudulent possession of goods, with intent to steal, neither by the law of nature, nor by the law of any civilized country, ever gave the wrong-doer a right to their possession; that the legal possession of such goods still remains with the true owner; and that every moment's continuance of such wrongful deprivation, with the intent to convert them to the taker's use, is a new taking; with what possible consistency, in reason, can a distinction be made on account of the locality from which the offender comes with his wrongful acquisition?

No matter whether he comes from another county or another state, or emerges from a state of nature for the first time, clothed with the moral guilt of larceny, our *common law* does not stop to inquire who he is, or from what clime he may have escaped, or of what offense he may have been guilty elsewhere; but finding him in the very act of taking, in this state, and carrying away the personal goods of another, with a felonious intent, against the laws of this state, it takes jurisdiction of the offense and the offender; otherwise our state not only affords refuge for

crime, but adds immunity for the past, license for the future, and right to the present possession, so far as relates to the principle, property so brought into our jurisdiction.

Larceny is defined to be "the wrongful or fraudulent taking and carrying away, by any person, of the mere personal goods of another, from any place, with a felonious intent to convert them to his own use, and make them his own property, without the consent of the owner."

The original taking must be a trespass. Amer. Cr. L., 1864. A trespass is any transgression or offense against the laws of nature or society, whether it relates to person or property.  3 Black. Com., 208.

In the absence of all civilized government, it is agreed by all writers, that occupancy gives right, and this is regarded as the origin of property.  Mr. Christian, in a note to the second volume of Blackstone's Commentaries, p. 8, familiarly illustrates the origin of property and the right to its enjoyment.  He says: "When an untutored Indian has set before him the fruit which he has plucked from the tree that protects him from the heat of the sun, and the shell of water raised from the water at his feet, if he is driven by any daring from this repast, so easy to be replaced, he instantly resents the violation of that law of property which Nature herself has written upon the hearts of all mankind."

The right of property, therefore, exists by the law of nature, independent of municipal law, and had its origin in the same immutable principles of reason and justice, under the law of nature, which is the great object of municipal laws to preserve and enforce.  That there was no government, no law, either common or statute, to punish the trespasser, who has possessed himself of the goods of the natural owner, does not sanctify his trespass, or ripen it into a virtuous or moral act, or give him title to the thing taken.  The moment, therefore, that he takes his unlawful acquisition into the jurisdiction of the common law, with the intent to convert it to his own use, he has brought himself in the new jurisdiction, within the strictest definition of larceny.  Such intentional violation of the possession and right of the true owner has every element in the definition, and every

essential of. the. moral guilt; and there can .be no good reason why it should not incur the penalty of larceny.    That Alabama is a sovereign state, having laws of her own against which the larceny in that state may be an offense, does not render the felonies in Mississippi the less an offense against our code.    There is nothing in the nature or character. of the respective offenses against the laws of the two jurisdictions calling for sympathy or lenity, or making the execution of the one dependent on the action of the other.    This merciful doctrine of exemption from penalty, because of the continued and wilful repetition of the same. offense, or of immunity for offenders, because of the number, enormity, and ubiquity of their offenses, is · one which can find no sanction in the true benignity of criminal jurisprudence.

Regarding the question as an open one in this state, we feel no hesitation in declaring the rule, *without exception*, as to the doctrine of the common law, " that the legal possession of goods stolen continues in the true owner; and every moment's continuance of the trespass and felony amounts, in legal consideration, to a new caption and asportation," which may be the subject of indictment in every state to which the goods are removed, at common law.

That an eminent jurist may have decided differently, and that others have. cited his error, who, in turn, have become the root of a new succession, adds nothing in our judgment to the force of *their. reasoning*, which alone gives force to judicial opinions or precedents.

Counsel for plaintiff in error. have mistaken the record in supposing that the third instruction, asked for the plaintiff in error, in the court below, was refused.

The third instruction was, " that to · make out the charge of larceny, it is necessary. to prove a taking and carrying away in the county in which the alleged felony is charged to have been committed ; and that the state, to sustain this prosecution, must prove a taking and carrying away of the negroes .in Clarke county."    This instruction was given, and not refused, as supposed.

The case before. us does not, therefore, involve the question before the court in the case of Norris v. State, 33 Miss. R., 373,

where this instruction was refused under a similar indictment.

The question, in this case, was one of fact, submitted to a jury, with proper instructions from the court. They found the defendant guilty, as charged in the bill of indictment, and with their verdict we see no good reason to find fault.

The motion for a new trial was properly refused.

Let the judgment be affirmed.